Ladies and gentlemen, please rise. This court is now in session. You may be seated. The clerk will call the next case. 321-0602, William R. Bussey III, appellant by Mark McQuarrie v. The Board of Trustees of the Joliet Police Pension Fund of Appalachia by Joseph Y. Schample Mr. McQuarrie, you may proceed. Thank you, Your Honor. Your Honor, Mr. Marzullo, may it please the Court. My name is Mark McQuarrie and I represent William Bussey, the appellant in this case. It is our position this Court should reverse the Pension Board's decision because the Pension Board ignored an enormous amount of competent, objective medical evidence and even common sense, which demonstrated that Officer William Bussey was disabled from full and unrestricted police service. When this Court views the record in its entirety, the Pension Board's decision was improper and warrants reversal. It is unrebutted how Officer Bussey was hurt. He was on duty and in uniform. He chased a fleeing suspect. He engaged in a physical altercation with a combatant, active resistor, and he injured his right hand. This evidence is undisputed in the record. He immediately reported this to his supervisor, Lt. Don Malik. Following his reporting it, he subsequently sought medical attention. The medical treatment he sought resulted in three surgeries to his right hand and specifically his right middle finger. Two surgeries were performed by Dr. Chen and one surgery was performed by Dr. Meha. With respect to Dr. Chen, when he opened up Officer Bussey's right hand, he saw torn ligaments. This was confirmed by an MRI that he visualized the actual injury to Officer Bussey's right hand. He performed a second surgery to again repair the hand that didn't work. In an effort to return to work, Officer Bussey had a third surgery, Dr. Meha. Dr. Meha again performed a surgery but was unable to return Officer Bussey to full and unrestricted duty. The court should note that both doctors that performed the three surgeries never cleared Officer Bussey to return to full and unrestricted police duty. It was a FCE, wasn't it? Yes, and I'm more than happy to address that, Your Honor. Well, don't you think that's pretty important? Certainly. So there were three IMEs conducted as well as a functional capacity exam. There was a fourth IME done by the workers' compensation provider, another physician, Dr. Tulipan. The FCE, we don't believe, is competent, credible evidence, and here's why. During Dr. Balaram's evaluation, which was one of the physicians paid for by the pension board as well as Dr. Tulipan, they actually observed the malfunction of the hand during the examination. That's objective evidence. The problem with the FCE, which was solely relied upon by Dr. Pittard, is a couple things. Number one, that was not done by a physician. That was done by a physical therapist. In addition, the physical therapist noted that she observed the subluxation during the FCE, but Dr. Pittard never even commented on it, and she's not a physician where she can opine as to what, if any, effect that would have on him being able to both be a full and unrestricted police officer and a physical therapist. In addition, I would submit to this court that the FCE defies common sense. We all know, in this court and out in the real world, that police officers have to be able to guard their weapon. They have to engage in weapon retention. They have to be able to pull out their firearm and, if necessary, use it. Not just fire the gun, but fire it accurately. The FCE definitely concluded that he could engage in these activities simply by holding a three-pound weight. That defies logic. That is not an accurate representation of being able to fire a firearm in an urban area accurately. In addition, another test, Your Honor, was they had him hold a stick and said, hold this stick while I move it around, and that equates to you fighting with somebody for your life and able to defend yourself and keep this individual in the custody. The FCE concluded that, based upon tests like that, that he was able to return to full and unrestricted duty. The problem is that those are A tests. Those are not B tests. And, to be honest, it's our opinion that those don't accurately represent the things a police officer has to do proficiently. They certainly don't override the medical opinions of specifically Dr. Ballaram and Dr. Heller. Dr. Ballaram, I think, is highly convincing. First of all, he reviewed all the evidence in the record that was given to him by the pension board. Additionally, during his examination, he said that he made objective findings of disability. He actually saw the subluxation of the middle finger during the examination. That's objective evidence. Now, you're going to hear, and you've read in these briefs, that the pension board claims that Dr. Ballaram and Dr. Heller, they made no objective findings. They simply took subjective reports given to them by William Bussey and relied upon those. That is not true. They conducted in-person examinations. They tested his grip strength. His grip strength was greatly diminished. And in their medical opinion, they concluded, two out of three of the IMEs conducted by the pension board, concluded that William Bussey was disabled. Much like the Stafford case that was recently decided by this court in 2021, where two out of three physicians concluded that the applicant in that case was disabled, the court reversed the pension board in that particular instance because they relied on one sole outlying doctor. In addition, we don't believe that Dr. Patari, which is the only doctor hired by the pension board, that concluded that William Bussey is not disabled, we believe that his opinion is faulty. For number one, he kind of outsourced, if you read his opinion, he really outsourced his opinion to the physical therapist and said, well, the FCE says he's not disabled, so that's good enough for me. Secondly, during the FCE, as I already previously stated, they observed the malfunction, the subluxation. Dr. Patari never comments about that. Now that's interesting because the pension board makes the argument that if you don't talk about it, we have to throw your opinion out. Well, that goes for all the doctors that they disagree with, which is Dr. Balram, Dr. Heller, Dr. Tulipan, Dr. Chen, and Dr. Mejia. We should disregard those and rely on Dr. Patari. Dr. Patari never talks about the subluxation that's noted in the FCE. Well, maybe you can enlighten us. What's so critical about subluxation? From my reading of the record is that it creates instability in the hand. So, for instance, the hand doesn't function properly. So sometimes you're able to grip something, other times you're not. As a police officer engaged in the protection of the public, it's critical that you have the normal use of your hand. A police officer can't afford in a deadly force situation to have his hand locked up. He can't afford in a situation where he needs to extract someone from a vehicle because they've been severely injured for his hand to lock up. It's unpredictable and it's unstable. So subluxation is when it slips out of joint, right? Correct. The tendon slips over and so it doesn't happen every time. Because if you notice, Dr. Heller says, look, you have diminished grip strength, you should not be a police officer. But he didn't observe the subluxation. But three people did because it is unpredictable. Dr. Ballroom observed it, Dr. Tulipan, the work comp IMV physician observed it, and the physical therapist observed it during the FCE. So we know it does happen and we know that it's repeatable, but it's unpredictable. On the record, you can have a condition, but your condition might not lead to disableness. You're making the argument that this condition leads to disableness. Where do we have the medical connection? We have a medical connection because questions of disability are largely left to physicians. And the physicians in this case, Dr. Ballroom and Dr. Heller, say he's disabled. And you're inferring, or did they make a direct statement, that that disability is due to subluxation? They said that he was disabled based on diminished strength in his right hand. And I can pull that up for you, Your Honor. Specifically, just give me a moment. Dr. Ballroom writes, given the continued subluxation of the tendon and extensor tendon centralizing reconstruction of the satchel band with autograft pulmonaris longus is an option for the patient. The patient does lack grip strength due to the right hand, given the subluxation of the extensor tendon. Therefore, if there are certain activities, such as grasping a firearm or apprehending a criminal that requires full and forceful, powerful grasp of the right hand, this condition can preclude him from performing full and unrestricted police duty. This is Dr.? What's his status? He is one of the IMAs hired by the pension board, and he's an orthopedic surgeon. Okay. Thank you. And does he refer to the FCE at all in any of his findings? No, and it's interesting, and that's something I do want to address, because the pension board goes to great lengths to say, look, these doctors are no longer credible because we don't care what they saw. That's not an objective finding, number one. And number two, they didn't talk about the FCE, which, again, the FCE is an exam. It is not the only exam. Interestingly, Dr.? Excuse me. Dr.? Heller makes an interesting note that we've hung up in our brief, where he says, in preparation for this independent medical evaluation, I reviewed all forwarded medical records. These records included but were not necessarily limited to the following. So he says, look, I read everything you gave me to the pension board. This is what I think is most important. And then he goes into his actual physical observations, where he finds officer Busty disabled. In addition, Dr.? also makes a notation in his report where he says, I reviewed everything. However, the following is a summation of everything that I reviewed. I would equate this very similar to a police report. It's not a verbatim account of everything that was read. This court received an administrative record well over 1,000 pages. This court certainly is not going to detail every page that they read, but they are going to write an opinion summarizing your findings and the court's findings. These IMEs are no different. They read everything that was given to them. And moreover, to speculate that they didn't read something I think is a little disingenuous, right? That involves speculation and conjecture. In addition. Well, there was also a physical exam, wasn't there? Correct. In addition, there were physical exams. And based on those physical exams, Dr.? Heller and Dr.? Ballaram, both board-hired physicians, concluded officer Busty was disabled. Included he was disabled. And that's all linked to this subluxation. Absolutely. Yes, Your Honor. And the other thing that I think is interesting is the board never brought this up at the hearing. We first learned of this at when they issued their written decision and order. Interestingly, they asked Dr.? Pittari for a supplemental report because they had sent him some surveillance video. But they never asked their two other IME physicians for supplemental reports. Had they been worried about this, had they been concerned about this, this process was well within their control to ask for a supplemental report from their experts. I see that my time is nearing. If the board has any more questions, I'm more than happy to answer those. I don't believe so. But you will have five minutes for rebuttal. Certainly. It was just respectfully requested that the board grant the reversal and award Bill Busty a land-duty disability pension. Thank you, Your Honor. Thank you, Mr. McClary. Mr. Weishamper? I'm so sorry, Ms. McClary. I did feel that it's too low. I didn't bring the form back in stating it was me, and I apologize. Mr. Marzullo? He's much better looking than I am, Mr. Weishamper, and I do have to note that. You're from the same firm, though. From the same firm. I am lead counsel, I guess, if I may. So you're not Mr. Weishamper? I'm not Mr. Weishamper. Who are you? Jerry Marzullo, M-A-R-Z-U-L-L-O. Yes. Yes, I'm lead counsel for this case, and I was the attorney for the hearing for the pension board. Ma'am? May it please the court, counsel, my name again, Jerry Marzullo, now that we've cleared that up, and I am legal counsel for the Joliet Police Pension Fund. So after four years of service as a Joliet police officer, the plaintiff physically struck someone one time. Well, we know all of that. Why don't we get to the crux of the issue? Great, absolutely. What's the standard of review? The standard of review in this case is manifest weight of the evidence standard. It is very clear that it's manifest weight of the evidence standard. That has been the clear standard for these types of cases over and over and over again, not only by the five appellate court districts but by the Illinois Supreme Court. And in addition to that, talking about the manifest weight of the evidence standard, that is not something that this board doesn't – that this board takes lightly. That has not meant that this court is to rubber stamp it and just say, oh, manifest weight of the evidence standard. It is what it is. That's not the case. At the end of the day, the record contains overwhelming evidence to support the board's decision, and it has to be affirmed because under the manifest weight of the evidence standard and under the case law here in Illinois, it is the board that is to resolve the conflicting evidence, and it is the board to assess the credibility of the witnesses, the experts, et cetera, and to come up with opinion, right? Everything goes into the little box and out spits an answer. And that is where we're at today. I understand or the board understands the plaintiff's attempts to take this court's eyes off the actual issues here and what took place. The plaintiff wants a lifetime disability pension. What are the actual issues? The actual issues here is that under the manifest weight of the evidence standard, when you look at what the board considered, the questions that were asked, the expert opinions, what the board did is it took the opinion of Dr. Tulipan in conjunction with the opinion, because remember, the plaintiff doesn't really talk about Dr. Tulipan too much. He talks about Dr. Tulipan in conjunction with the report of Dr. Pittari, in conjunction with the only objective test. So the plaintiff says, well, the FCE is a test. It's not the test. Members of the court, if it's not the test, then I don't know what test there is because it is the only objective finding in the record, in addition to the doctor's examinations of the plaintiff when he went through the IME process. So there is objective evidence, not just from the FCE? There is objective evidence, if you recall. Well, in each, read 1,000 pages of records, right? In the IME reports of all three doctors, they do talk about the examination that was done, what they did note, et cetera. Even Dr. Pittari does note. I know it's a tenderness or however he frames it, but he does note that there are objective findings and he does his examination in that report, but he takes that in conjunction with the functional capacity evaluation. Now, remember, it is the applicant's burden of proving an entitlement to any disability claim. So any claim by the plaintiff that the board should have done this or the board could have done that, plaintiff should have done this and plaintiff could have done that. They had every opportunity to go for another FCE or depose the physical therapist or challenge the findings in any way possible. They could have deposed Dr. Pittari, could have deposed Dr. Valorum, Dr. Heller, et cetera. It is the plaintiff's burden of proof to come forward and say, this is why you should give me a lifetime disability contract. If we were to back down, is it the issue of subluxation and whether that's disabling in terms of his police duties? Yes. If I may, Justice, I do have to back up for a second because the board doesn't believe that there's any subluxation there or if there is, it is so minimal that it's not disabling, right? So at the end of the day, what you have regarding the subluxation or the tenderness or the swelling or lack of grip strength, what you have is Dr. Tulipan. We have to start there with the board's decision. And Dr. Tulipan says over and over again, I'm going to paraphrase here, but it's in the briefs. And where did he come from? So Dr. Tulipan is a workers' compensation IME provider that is part of the record. So what we do routinely in these cases is not only do we get the plaintiff's medical records, but we administrate a subpoena to the city, the workers' compensation records, et cetera, because we have the complete findings. Because under a case called Jensen v. East MD, the board, again, puts everything in a little box and spits out an answer. So Dr. Tulipan is one of the work comp record providers. And Dr. Tulipan says basically at the end of the day, something's not right here, okay? It's taking him an awful long time to recover from this injury. And his subjective complaints do seem out of proportion to the objective findings that I'm seeing. So Dr. Tulipan really doesn't find him disabled but doesn't find him not disabled. And he says there's something fishy here. He should go for an FCE. And lo and behold, he goes for the FCE. Now, contrary to what plaintiff says, the FCE took into account the job description, and in addition to that, the FCE took into account not one but four job activities, controlling an active resistor, firing a weapon, push and pull, and trigger pull. And what that FCE finds is regardless of the subluxation or not, he's able to do the job. He's met every single requirement. That is the objective finding. Did he shoot a gun? Well, great question, Justice, if I may. The plaintiffs testified on the record that since the February 2017 incident, he never bothered to try to fire his weapon. I mean in the FCE. Did he shoot a gun? He did not fire a weapon. What he did is he did the trigger pull for the pound weight of the actual weapon or of the trigger. So he did not fire the live round. He did simulate the weight and the trigger pull of what would have been required to fire the live round. Why would you simulate that? Why wouldn't you just hand an empty gun and say point at the wall? I have no idea. I don't do the functional capacity evaluations. But given the record and given the testing, this is it. So they're saying that the test was analogous to actual firing of a weapon. Correct, because the firing of the weapon involves the gripping of the weapon and the pulling of the trigger. And it is analogous because it is the weight of the weapon and the actual trigger pull. So when I say the weight of the trigger pull, you know, it's not the – there's weight involved when you're actually pulling on the trigger. That's what he did with the functional capacity evaluation. I don't know if we want people firing – The weight is resistance. Resistance, excuse me. And I don't know if we want people firing off live rounds in functional capacity evaluations. So, you know, they may be. Okay, but it was during the course of this simulation that the physical therapist observed at least one incidence of subluxation. Correct. He was able to complete the tasks. And that brings up another good point, if I may. Doctor – I think it was Dr. Ballaram who finds, again, on the grip strength on the right side, which is the injured side, four or five, on the left side, five or five. Okay, so there is reduced grip strength. And there is subluxation which may or may not happen or may or may not exist. The point is, is that just because you have reduced trigger capacity or, you know, the pounds that you can pull, X number of pounds on the right side and X number of pounds on the left side, does not mean that you cannot do the job. No one is the same as they get older. No one is – we don't get better, stronger, and faster with age. So he is able to do the job regardless of the subluxation. Okay, so Justice McDade is correct on the record that the physical therapist saw subluxation, observed subluxation. I believe under the functional capacity evaluation they did observe the tenderness and swelling, but I cannot recall if there is a subluxation by the physical therapist. Great, yes. But then that even just proves the defendant board's point that even with the subluxation, this individual is able to perform all of the job duties and responsibilities and was able to pass the functional – But that's only if there was observed subluxation by the physical therapist. Correct. But we don't know. Under the functional capacity evaluation, I cannot recall if there was the actual observing of the subluxation. Well, let's assume for a moment that it was not, that it did not occur during this physical therapist evaluation and exam. But if we have other physicians who did see it, am I correct? Yes, you do have other – you have other physicians that did see it. You had some physicians that did not see it. Well, yeah, but unless you found the physician who did see it not credible, where is there – is there anything in this record that links subluxation to a diminishment of the ability to perform duties? There is not. And I am not a physician. There is not. There is nothing in the record. In fact, to the questions that you were asking previously, Dr. Heller finds that the subluxation and the other issues resolved. Dr. Bellram only tests and discusses the grip strength. And Dr. Patari doesn't observe the – what he observes in the hand is the – is any tenderness and swelling in his hand. And he does make those physical observations and those findings. Dr. Patari. So he does take that into account. But that's a different condition, isn't it, tenderness? Correct. What's your understanding of subluxation? It's the – it's the tendon that is moving or the tendon that is not tracking. And what happens to that? So it does not, as I understand it from the record, it doesn't track over the knuckle properly. Yeah, but what's the effect of that? There is no effect of that to the board. He's able to, regardless of whether that – Is there anything about the medical effect of subluxation that, yeah, moving around here, but I thought I heard from somewhere there was locking, locking. But, again, what the board found, though – Subluxation, locking. Yes, to a degree, because I think it's all just sorts of movement and instability in there. But what the board found, though, is that that issue resolved because even one of the IME doctors, that plaintiff wants you to find credible, that it was, again, up to the board to determine under manifest weight of the evidence, does find that the subluxation issues did resolve themselves. So you have Dr. Heller that finds that the subluxation issues resolved themselves. You have Dr. Katari who looked at the functional capacity evaluation and really found regardless of this whole subluxation issue, I observed the tenderness and swelling. I did make a note of that. I did a physical examination of him. I then reviewed that with the – in conjunction with the functional capacity evaluation. In addition to that, you also have Dr. Tulipan who observes, finds that all of these issues have resolved and doesn't understand why his subjective complaints are out of proportion with his objective findings and really is the first doctor that says he should be going for the functional capacity evaluation. And away we go. So there is – under the manifest weight of the evidence standard, it is completely appropriate for the board to take a look at this whole picture of Dr. Tulipan, Dr. Katari, and the functional capacity evaluation and find he's not disabled. He is able to work full and unrestricted duty. I'm sorry. I'm sorry, Mr. Marzullo. It seems to me that the findings are indicating that if the stars align in a certain way, he's not disabled. If they align in a different way, he is disabled because he's got this problem that's going to stop him from being able to do some of the essential functions of his job. So Justice – Just let me – Sure. I'm sorry. I should probably not interrupt Supreme Court or trial court justices, but yes. So basically the finding that's made by the pension board is that Mr. Busse is able to be back on the street and operating as a police officer. Would you put him back there? Yes. You would? Yes. And you would feel comfortable if he was called on to protect you? Yes. Yes. I absolutely would because what the pension board found is that – and the pension board allowed to do this and place this credit. It might not be what plaintiff wants, but what the pension board found is Dr. Tulipan is not seeing the reason why plaintiff is having the issues that he is having. We then find that in conjunction with the F.C.E. and Dr. Patari's findings, we are in agreement with that. And that is the – that is exactly what the pension board is supposed to do. They're supposed to resolve that. And that's what the case law says. If there is – under Carrillo, if there is a split regarding causation, it's the board that resolves this issue. So the pension board found that at the end of the day, he is still able to do this job. And it is perfectly acceptable to do so. And all of the records – excuse me, there are records to support that decision. There are just as much objective findings to show that he can do the job as a lack of objective findings on the part of the plaintiff to show that he cannot. Is he back on the job? He is not. He is not because he is in appeal. I don't – let me put it to you this way. That's not our purview. So when we find somebody that's disabled, that becomes a whole labor – or not disabled, excuse me, a whole labor management issue. He is not back on the job as we sit here today. Yes. Yes. I have a question, and it does relate to Justice McDade. So in the SCE report, it goes through him having to use altered mechanisms in order to lift crates and things. And it does not go into – there's no test for retaining his weapon if someone tried to take it away from him or using handcuffs, which I believe are part of the top – some of the top job requirements. But it does talk about in the event of, you know, that he obviously favors his dominant hand, and it appears that so long as there's no sublocation, subluxation, that he can do the job of some kind, that he doesn't need to lift 180 pounds. He needs to have 60, and he passes that. But the part that concerns me is if the subluxation is something that would stymie the use of his weapon or holding a suspect or pulling someone from a car, is what you're saying is so long as that happens 50% of the time or 60% or – the FCA, that there was concerns about him being able to do all of the things correctly. And so it seems that what the board is saying is, well, for his age and his gender, the amount that he can lift is okay. But it doesn't address what happens if his grip freezes, and so it's okay if every two times he has to pull his weapon, it doesn't freeze again. The third time it doesn't, that's sufficient? Because it seems like it's almost like an apple and apple. We know that, yeah, you're going to – at 25, you're going to have better strength, probably when you're 45, but you can still be a police officer. Correct. But to me, the other issue is that, is it all right if you might be able to have no problem other than pain 60% of the time, but 40% of the time, you might, you know, the joint might pop out, and then you can't do any of the job. So is that what you're saying? That's okay given, you know, his age and his gender, is that this thing may or may not happen, so since it doesn't happen all the time, he's not disabled. But, Justice O'Brien, even his treating physician that did the third surgery, which is Dr. Mejia, even one of the IME doctors, Dr. Ballaram, that the plaintiff is asking you to rely on, have found that the subluxation issues have resolved themselves. What you have in this instance is a plaintiff that the board did not find particularly credible in regards to their subjective complaints in the subluxation, if it is happening, if it's not happening, etc. And because of that, what the board is allowed to rely on is the findings of the doctors and the findings of the functional capacity evaluation. So there is nothing in the record to show that at the time he was examined by Dr. Pittari and at the time he underwent the functional capacity evaluation, etc., that subluxation was an issue anymore. If you do look at the record, even his own doctor says the tracking issues have resolved themselves. Even Dr. Ballaram finds subluxation has resolved itself. Dr. Pittari doesn't see it, but he feels the mildness, the tenderness, the swelling. That goes into Dr. Tulipan's report and supports it. That goes into the functional capacity evaluation. And that's why the board found it did what it did, asking question after question after question of the board and delineating those findings in a 30-plus page decision and order. Okay, you've got Dr. Tulipan who says it's resolved itself, correct? Correct. And you're saying there's nothing in the FCE report that said it occurred during the exam, correct? Correct. Okay. And so we do have some other doctors who say they observed it. What time point prior, in between second and third surgeries, when did that occur? We just don't know. But the issue, though, then goes back to even if they do observe it, under Dr. Pittari's examination and under the functional capacity evaluation, he is still able to perform the job duties, et cetera. So he is able to do the job. Yeah, but did they see when they made that conclusion or, okay, from the exam, they didn't see it. So are they speculating that if it does occur, he can do the job? Well, I guess then it becomes a luck of the draw issue that as a matter of timing, some doctors observed it and then some doctors didn't observe it. But at the end of the day, you do have two doctors who do say that it has resolved, and you do have Dr. Pittari that doesn't observe it, and you do have an entire functional capacity evaluation where it did not occur and did not happen. So put another way. What is the basis of Dr. Tulipan's it has resolved? Dr. Tulipan's basis for it has resolved is in his report, and he sits there and says this is all outside of what I'm seeing here, that his subjective complaints of pain, et cetera, and issues are not what I am seeing. What is he seeing? He's seeing an individual who's engaging in symptom magnification is what he's seeing. Well, that's the conclusion. Correct. But is he seeing anything objective that says it's resolved? He's not seeing anything regarding subluxation, and he's just going back to seeing that there is tenderness, swelling, et cetera, like Dr. Pittari. So him and Dr. Pittari are kind of on the same page in terms of what they're seeing. So they both said that it has resolved? Dr. Tulipan has no issues regarding subluxation. His own treating doctor, Dr. Mejia, says that it has, the tracking issues have resolved. Dr. Pittari says that it's not an issue any longer, et cetera. Somebody actually said it has resolved. Well, his own treating doctor, Dr. Mejia, says that it appears that his tracking issue has resolved. His tracking issue is the problem that leads to subluxation. That's correct. I think we all want to get that simple. Yes. His own treating doctor, after the third surgery, says that this issue appears to have resolved. His tracking is simply that the ligaments are being, as they stretch and retract. The doctors really use the tracking issue and the subluxation all in the same terms for the instability, that it's just not tracking properly and that it's moving and that there's the instability. Basically, at the end of the day, what Dr. Mejia found is that that issue has resolved itself. That's his own treating doctor. So therefore, there should not be subluxation. That's correct. And nobody saw subluxation after his treating doctor saw him? I think that, well, Dr. Balleron, who's one of the IME providers, didn't see it. Wasn't seen in the FCE. Wasn't seen by Dr. Tulipan. Wasn't seen by Dr. Patari. I do believe that Dr. Heller doesn't test for that. I mean, Dr. Heller tests for grip strength, and Dr. Heller finds that the grip strength of the right hand is almost as powerful as the left hand. So, yes, Dr. Heller finds the grip strength in the objective findings of 4 out of 5 and the grip strength in the left hand 5 out of 5. And actually, another issue of symptom magnification, Dr. Patari does find that because of what Dr. Patari finds is that the plaintiff was less than credible because when you look at his upper body strength, the musculature of his arm, hands, et cetera, that he's using his right hand to a greater degree than what he is admitting during the independent medical examination. So everything here points to the fact that this issue has resolved and he can return to full and unrestricted duty. And there are medical findings to support that. And that's how the board ruled. And that's the manifest way to the evidence. And that's the manifest way to the evidence. Thank you. Any further? Thank you. Mr. McQuarrie for rebuttal. Thank you, Judge. What you just heard was wholly incorrect. Wholly incorrect. On page C1012, Dr. Ballaram, remember how pension boards do this. The independent medical examinations conducted by the pension board are the very last thing that happens before the case goes to hearing. Dr. Ballaram on C1012 observes subluxation. On C962, the FCE observes subluxation. She writes, the extensor tendon on the right middle finger was observed to sublux once during testing. This occurred while retesting grip strength and trigger strength. There was subluxation. Dr. Tulipan comments about the subluxation on C956. There is a plethora of evidence in the record demonstrating that subluxation occurs. In fact, Dr. Ballaram, who is one of the last physicians to conduct an IME before this went to hearing, long after Dr. Chen and Dr. Mejia conducted their surgeries, writes something very telling. He notes, if you'll just give me one second here, he notes that his current condition includes right middle finger metacarphalangeal joint extensor tendon instability and healed collateral ligament repair. The patient reports pain. Given the objective findings present on the examination of an actively subluxating extensor tendon, this is objective evidence of a disabling condition. He further writes... He said an actively subluxating? Actively subluxating, and, Your Honor, that's on C1012. And, in fact, he writes at one point, and I'm having trouble finding it, that he noted that Dr. Mejia said there was no subluxating in the hand anymore, but that's incorrect because he observed it on February 17, 2020. He's one of the last physicians, excuse me, to conduct an IME, and he observes the subluxating injury. And what does he conclude? He concludes that he's disabled. Dr. who? This is Dr. Ballarat, concludes he's disabled. Dr. Ballarat. Dr. Heller, the other IME physician hired by Lurk, also concludes he's disabled. Do we have any doctor that says there's subluxation still present? Yes. But he can go back to work? Yes. No. You don't have that in the record. And the interesting thing is, to pick up on Justice O'Brien's questioning, she seemed to have a question, and I may be reading this wrong, about what defines disability, okay? And so it's very interesting. So in Article III of the Pension Code, it talks about disability,  But Article V, which is the police pension code for the city of Chicago, which is where we get our active duty definition for Article III, does define disability under 40 ILCS 5 forward slash 5-115. And it says, Any duties. Any duties in the police service, end quote. Any duties. If it doesn't work 5 out of 10 times, that's a problem. If you can't handcuff, that's a problem. If you can't use baton strikes, that's a problem. It's any assigned duties. Not 90% of the time. Okay, let's stop right there. Who decides that? I believe that that is a legal question, because it requires this court to apply facts to a term in a statute, and as such, that becomes a mixed question of law. Correct. This court does. Correct. Correct. Absolutely, Your Honor. And that's why we're here today. Because we believe that the board disregarded a plethora of evidence that showed the physical malfunction of the hand. So, okay, in a simple manner, manifest. It's against the manifest way of the evidence, okay? We're never sure what that's going to mean. But we often review and say, is there any evidence in the record to support the finder fact, in this instance, the Disability Board, that this gentleman is disabled? I think, Your Honor, when looking at the entire record, which is the Bowling v. Murphysboro decision, which was adopted by this court in Stafford, Hampton, and Garrotte, I believe recently, that you have to look at the record in total and decide whether or not the decision is against the manifest way of the evidence. They have one doctor. We have five doctors. I know that these are also in the case law. If there's anything in that record that will sustain the decision of the board, it's not against the manifest way of the evidence. I believe Stafford contradicts that. I believe Stafford says, when you look at the record in total, it's not just some evidence. It's got to be, number one, competent evidence. And we have to look at the entire record. But competent evidence doesn't mean there's ten here and one here. Therefore, the ten wins. Well, Dr. Pittari never saw it, never commented on the subluxation during the FCE at all. And that's an important component. That's the crux of this case is the malfunction. It doesn't have to happen every time to disable a police officer. I guess what I'm looking for is where, if the board determines, I mean, could the board say he's not disabled but he has subluxation? I don't know if the board made that finding. What the board has said is to discredit Drs. Heller and Ballaram. They said that there's no objective. They made no objective findings. I believe that that is factually and legally incorrect. If you look at Lambert and Kazookas, which we cite in our case, a doctor's diagnosis and observations are objective findings. As such, we respectfully request that you overrule the pension board and grant Officer William Bussey a line-of-duty disability pension based on the overwhelming evidence in the record. Thank you, Your Honors. Thank you, Mr. McQuarrie. Thank you both for your arguments here today. This matter will be taken under advisement and a written decision will be issued to you as soon as possible. With that, we will stay in recess until 2 p.m.